**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| RODERICK E. THEIS II, | Nos. 25-5641 |
| | 25-8039 |
| *Plaintiff - Appellant*, | |
| | D.C. No. |
| v. | 2:25-cv-00865-HL |
| INTERMOUNTAIN EDUCATION SERVICE DISTRICT - BOARD OF DIRECTORS; MARK S. MULVIHILL, Superintendent, in their official capacity; AIMEE VANNICE, Assistant Superintendent and Director of Human Resources, in their official capacity | OPINION |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the District of Oregon
Andrew D. Hallman, Magistrate Judge, Presiding[*]

Argued and Submitted April 13, 2026
Portland, Oregon

Filed July 21, 2026

---

[*] The parties consented to trying the case before a magistrate judge. *See* 28 U.S.C. § 636(c).

Before: John B. Owens, Lawrence VanDyke, and Jennifer Sung, Circuit Judges.

Opinion by Judge Owens;
Dissent by Judge VanDyke

## SUMMARY[**]

### First Amendment

The panel affirmed the district court's order denying plaintiff Roderick E. Theis II's motion for a preliminary injunction in his 42 U.S.C. § 1983 action against InterMountain Education Service District ("IMESD"), its Board of Directors, and other officials, alleging that defendants violated his First Amendment rights under the Free Speech Clause by directing him to remove certain books from his offices and by reprimanding him for displaying those books.

Theis, a licensed clinical social worker who served as an Education Specialist within the IMESD, displayed two books—*He Is He* and *She Is She*—in his office at La Grande Middle School. These books share the themes that gender is binary and cannot be changed. In his Elgin School District office, Theis displayed on his desk a different children's book—*Johnny the Walrus*—which allegorically comments on transgender issues. Following a complaint, Theis acknowledged displaying all three books in his offices while

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

meeting with students on the job, but said that he had never intended to harm anyone and that the books were not hostile. IMESD concluded that Theis's display of the books constituted a bias incident, directed Theis to stop displaying the books in his school offices, and warned that noncompliance could result in discipline, including termination.

The panel held that the district court did not abuse its discretion in denying his motion for a preliminary injunction given the robust body of precedent holding that educators speak as government employees when they convey messages to students within the four walls of a school. As a government employee, Theis was assigned to work in school offices, meet with students, and carry out his duties in that setting. His speech occurred in the course of those responsibilities and cannot be meaningfully separated from them. As such, Theis's speech falls outside the First Amendment's ambit.

Because the panel determined Theis's speech was beyond First Amendment coverage, it did not conduct the *Pickering* balancing test.

The panel distinguished this case from *Kennedy v. Bremerton School District*, 597 U.S. 507, 509 (2022), because Theis was not engaged in a moment of private expression detached from his role, but rather, he was engaged in his core professional responsibilities.

The panel addressed Theis's additional claims in a concurrently filed memorandum disposition.

Dissenting, Judge VanDyke wrote that, like the personal views that Theis's colleagues were permitted to express in their offices, Theis's placement of three children's books as

decorations in his office was his own personal expression, not the government's. The Supreme Court in *Kennedy* established that some employee expression remains personal even though it is observed by students on school grounds, and the majority's approach cannot be reconciled with *Kennedy*. Judge VanDyke further wrote that because Theis's office decorations related to a matter of public concern and because the record contains no evidence of any disruption to IMESD's interests that could outweigh Theis's speech interest, Theis's expression is protected by the First Amendment under *Pickering*.

## COUNSEL

Mathew W. Hoffmann (argued), Tyson C. Langhofer, and Matthew C. Ray, Alliance Defending Freedom, Lansdowne, Virginia; David A. Cortman and Travis C. Barham, Alliance Defending Freedom, Lawrenceville, Georgia; John J. Bursch, Alliance Defending Freedom, Washington, D.C.; Rebekah Schultheiss, Law Offices of Rebekah Millard LLC, Springfield, Oregon; for Plaintiff-Appellant.

Blake H. Fry (argued) and Janet M. Schroer, Hart Wagner LLP, Portland, Oregon, Defendants-Appellees.

Kevin J. Daniel and Gareth A. Bowen, Troxell Leigh PC, Leesburg, Virginia, for Amicus Curiae Parents' Rights in Education.

Justin M. Oliveira and Emily Jones, Jones Law Firm PLLC, Billings, Montana, for Amici Curiae Montana First Amendment Society, Montana Public Policy Center, and 1776 Foundation.

J. Michael Connolly, Cameron T. Norris, and Paul R. Draper, Consovoy McCarthy Park PLLC, Arlington, Virginia, for Amicus Curiae Defending Education.

Deborah J. Dewart, Attorney at Law, Hubert, North Carolina, for Amicus Curiae NC Values Institute.

Meredith H. Kessler and John A. Meiser, Lindsay and Matt Moroun Religious Liberty Clinic, Notre Dame Law School, Notre Dame, Indiana, for Amicus Curiae Lindsay and Matt Moroun Religious Liberty Clinic.

J. Marc Wheat, Advancing American Freedom, Washington, D.C.; Madison Hahn, Young America's Foundation, Reston, Virginia; Celia Howard O'Leary, Southeastern Legal Foundation, Roswell, Georgia; for Amici Curiae Young America's Foundation, Advancing American Freedom, and Southeastern Legal Foundation.

# OPINION

OWENS, Circuit Judge:

Roderick E. Theis II appeals from the district court's order denying his motion for a preliminary injunction and from the district court's separate order denying his motion to enforce its partial preliminary injunction.  We have jurisdiction under 28 U.S.C. § 1292(a), and we affirm.

## I.  BACKGROUND

### A.  Theis's Work and His Offices

Theis, a licensed clinical social worker, served as an Education Specialist within the InterMountain Education Service District ("IMESD") for more than fifteen years.  In that role, he assessed and supported students' educational needs for schools in eastern Oregon.  His duties included meeting individually with students, administering standardized assessments, preparing reports, and consulting with educators.

Theis maintained offices at La Grande Middle School ("La Grande") and in the Elgin School District ("Elgin"). Students entered these offices for evaluations and standardized testing under his supervision.  Although Theis also used the offices for administrative work when students were not present, his workspaces functioned, at least in part, as locations where he interacted directly with students in the course of performing his job duties.

Like others who worked at La Grande and Elgin, Theis decorated his office with personal items, which led to this litigation.  In his La Grande office, he displayed two books— *He Is He* and *She Is She*—on the windowsill behind his desk.

These books share the themes that gender is binary and cannot be changed. In his Elgin office, Theis displayed on his desk a different children's book—*Johnny the Walrus*—which allegorically comments on transgender issues through a story in which the protagonist, Johnny, pretends to be a walrus. Defendants characterize *Johnny the Walrus* as conveying an anti-transgender message.



Theis's La Grande Middle School office.



Theis's Elgin School District Office.

### B. IMESD Policy and Complaints Regarding Theis's Book Displays

To comply with Oregon law, which prohibits discrimination in public education and requires education providers to adopt a policy addressing "bias incidents," IMESD adopted its "Every Student Belongs" ("ESB") policy.[1] The policy defines a "bias incident" as a "hostile expression of animus" based on a protected characteristic, including gender identity. The policy also establishes

---

[1] *See* Or. Rev. Stat. § 659.850 (noting that "[a] person may not be subjected to discrimination in any public . . . service [or] school," and defining "discrimination" to include differential treatment on the basis of gender identity); *see also id.* § 339.347(3) ("To comply with the prohibition on discrimination required by [Or. Rev. Stat. § 659.850], each education provider must adopt a policy to address bias incidents").

procedures for reporting, investigating, and making findings about whether a bias incident has occurred.

In October 2024, IMESD received a complaint about the display of *He Is He* and *She Is She* in Theis's La Grande office. The complaint contended that the book displays were transphobic and a bias incident in violation of the ESB policy, so IMESD initiated an investigation. During a meeting with IMESD officials, Theis acknowledged displaying all three books in his offices while meeting with students on the job, but said that he had never intended to harm anyone and that the books were not hostile. He added that he "might put the books aside" if he knew that a transgender student would be entering his office.

In November 2024, IMESD issued a written directive concluding that Theis's display of the books constituted a bias incident, as it was a "hostile expression of animus" related to gender identity. The directive instructed Theis to stop displaying the books in his school offices, and warned that noncompliance could result in discipline, including termination. The Superintendent and the IMESD Board rejected Theis's appeals.

### C. Procedural History

In May 2025, Theis filed this action under 42 U.S.C. § 1983 against IMESD, its Board of Directors, and other officials. He alleged that Defendants violated his First Amendment rights under the Free Speech Clause by directing him to remove certain books from his offices and by reprimanding him for displaying those books.[2] Theis

---

[2] Theis raises additional claims, including under the Free Exercise Clause and the Due Process Clause, and Defendants make jurisdictional and mootness arguments. We address those issues in a concurrently filed

sought declarative and injunctive relief, including permission to display the books. Shortly after filing suit, Theis moved for a preliminary injunction to halt the enforcement of the directive. The district court granted the motion in part and denied it in part, and drew a careful distinction between student-facing settings and those outside the presence of students. Relying on *Dodge v. Evergreen School District #114*, 56 F.4th 767 (9th Cir. 2022), and *Johnson v. Poway Unified School District*, 658 F.3d 954 (9th Cir. 2011), the district court concluded that when Theis displayed the books "*while engaged in speech that IMESD paid him to produce* as an Education Specialist"—for instance, when he administered evaluations to students—he spoke as a public employee, not a private citizen. Therefore, IMESD could prohibit Theis from displaying the books when students were present. But when students were absent, Theis spoke as a private citizen, so his expression received First Amendment protection, and he could display the books. Following the district court's order, Theis timely appealed from the partial denial of preliminary injunctive relief.

After the district court issued its order permitting Theis to display the books only when students were not present, Theis resumed displaying the books. Students entered his office and accessed the books. In at least one instance, Theis discussed the content of the books with students. IMESD initiated a second investigation, concluded that Theis had violated its policies and the terms of the preliminary injunction, and began disciplinary proceedings.

Theis then moved in the district court to enforce the preliminary injunction, arguing that the proposed discipline

---

memorandum disposition. In both this opinion and the memorandum disposition, we affirm.

violated the court's order.  The district court denied that motion, concluding that the injunction did not protect Theis's display of the books *in the presence of students* and therefore did not bar discipline for that conduct.  IMESD subsequently terminated Theis's employment.

Theis filed a second appeal challenging the denial of his motion to enforce the preliminary injunction.  Both appeals are before this court.

## II.  DISCUSSION

### A.  Standard of Review

We review a district court's denial of a preliminary injunction for abuse of discretion.  *Harris v. Muhammad*, 165 F.4th 1345, 1350 (9th Cir. 2026).  "The abuse of discretion standard is highly deferential to the district court." *Betschart v. Oregon*, 103 F.4th 607, 616 (9th Cir. 2024) (quotation marks and citation omitted).  We review the district court's underlying legal conclusions de novo and its factual findings for clear error.  *Id*.

### B.  There Was No First Amendment Violation

### 1.  Theis Spoke as Part of His Official Duties

For decades, circuit courts have uniformly rejected First Amendment arguments like Theis's.  "[N]o court has found that teachers' First Amendment rights extend to choosing their own curriculum or classroom management techniques in contravention of school policy or dictates."  *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1176 (3d. Cir. 1990).  As then-Judge Alito explained, although an instructor "has a right to advocate outside of the classroom for the use of certain curriculum materials, he does not have a right to use those materials in the classroom."  *Edwards v.*

*Cal. Univ. of Pa.*, 156 F.3d 488, 492 (3d. Cir. 1998); *see also Ahern v. Bd. of Educ. of Sch. Dist. of Grand Island*, 456 F.2d 399, 403 (8th Cir. 1972) (holding that a teacher has no First Amendment right to "persist in a course of teaching behavior which contravened the valid dictates of her employers, the public school board, regarding classroom method"); *Adams v. Campbell Cnty. Sch. Dist.*, 511 F.2d 1242, 1247 (10th Cir. 1975) ("We have found no law which allows a high school teacher to have the broad latitude" to instruct in conflict with official school curriculum).

In 2006, the Supreme Court made clear that the First Amendment protects a public employee's speech only when he speaks as a citizen, rather than as part of his official duties. *See Garcetti v. Ceballos*, 547 U.S. 410, 417–21 (2006). When a public employee makes statements "pursuant to [his] official duties," he does not speak as a citizen for First Amendment purposes, and "the Constitution does not insulate [that] communication[] from employer discipline." *Id*. at 421.

We employ a "practical" and "fact-intensive" inquiry to determine whether speech is made pursuant to official duties. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074–76 (9th Cir. 2013) (en banc). Theis "bears the burden of showing [that] the speech was spoken in the capacity of a private citizen and not a public employee." *Eng v. Cooley*, 554 F.3d 1062, 1071 (9th Cir. 2009). He has not met his burden here.

First, Theis's speech occurred within the scope of his professional role. It was confined to the environments—his offices—in which he was assigned to perform his duties and to times when he was with students. And Theis does not dispute that his speech was aimed at students. This case is therefore distinguishable from those in which a school

employee engages in the challenged speech off school grounds or while performing tasks unrelated to the school's ordinary operations, and from cases in which the employee does not direct his speech to students. *See Dodge*, 56 F.4th at 778 (holding that a teacher's decision to wear a "Make America Great Again" hat at a teacher-only training was private speech because he did not wear it in school with students).

Second, and most importantly, Theis's speech "owes its existence to his position" in the IMESD schools. *Id.* at 967. Theis displayed the books in his offices where he interacted with students as part of his assigned duties, and the displays were visible to those students during evaluations and meetings. In *Johnson*, we held that a teacher's classroom expression constituted government speech because it occurred in a setting where the public employer "hires that speech," thereby retaining authority over the message conveyed to students. *Id.* at 967–68 (citation omitted). Like the teacher in *Johnson*, Theis was in a position to speak to students as an authority figure only because the school "hire[d his] speech"; indeed, "[a]n ordinary citizen could not have walked into [Theis's office] and decorated the walls as he . . . saw fit." *Id.* at 966, 968.

And as we explained in *Johnson* and reaffirmed in *Dodge*, speech directed at students within a school setting "in a capacity one might reasonably view as official" is speech undertaken as part of a public employee's official duties. *Id.* *See also Dodge*, 56 F.4th at 778 (That the challenged speech did not take place "in school with students . . . distinguishes this case from other cases involving speech in schools where the speech was reasonably viewed by students and parents as officially promoted by the school.").

Other circuits have reached the same conclusion with striking consistency. The Seventh Circuit has explained that in the K–12 setting, "[e]xpression is a teacher's stock in trade, the commodity she sells to her employer in exchange for a salary"; accordingly, "the school system does not 'regulate' teachers' speech as much as it *hires* that speech." *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) (emphasis in original). "The Constitution does not entitle teachers to present personal views to captive audiences against the instructions of elected officials." *Id*. at 480. The Sixth Circuit has similarly held that a teacher's classroom expression is speech pursuant to professional duties, and is thus not covered by the First Amendment. *Evans-Marshall v. Bd. of Educ. of the Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 340–41 (6th Cir. 2010).

More recently, the Eleventh Circuit confirmed that when a public-school employee speaks "in the course of performing [one's] job," including in interactions with students, that employee does so "as a government employee, not a citizen." *Wood v. Fla. Dep't of Educ.*, 142 F.4th 1286, 1291–92 (11th Cir. 2025) (internal quotation marks and citation omitted). These dictates apply to visual displays as well as to spoken speech. *See Johnson*, 658 F.3d at 967–68 (classroom banners); *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 694 (4th Cir. 2007) (classroom bulletin boards). And it makes no difference that the displays appeared in offices rather than classrooms. Theis does not dispute that speech may be curricular so long as it is delivered by public-school employees and "designed to impart particular knowledge or skills to student participants and audiences." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988).

These cases reflect a settled principle: when a public education employee communicates messages to students in

a pedagogical or evaluative setting, he is performing the work he was hired to do.  Indeed, the idea that the First Amendment leaves the government completely "power[less] to restrict expression because of its messages, its ideas, its subject matter, or its content" does not apply in public schools, where "some higher degree of content regulation is a necessity" for government institutions to function.  Leslie Kendrick, *Content Discrimination Revisited*, 98 Va. L. Rev. 231, 235–36 (2012) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).

Taken together, these factors confirm that Theis's speech "owe[d] its existence" to his professional responsibilities and was undertaken as part of the work he was paid to perform.  *Garcetti*, 547 U.S. at 421.  As a government employee, Theis was assigned to work in school offices, meet with students, and carry out his duties in that setting. His speech occurred in the course of those responsibilities and cannot be meaningfully separated from them.[3]  As such, Theis's speech falls outside the First Amendment's ambit.

### 2.   The Effect of *Kennedy v. Bremerton*

Theis and the dissent contend that *Kennedy v. Bremerton School District*, 597 U.S. 507, 509 (2022), which held that a football coach's brief, postgame prayer on the field constituted private expression outside the scope of his professional duties, effectively overruled our decision in *Johnson*, 658 F.3d 954 (9th Cir. 2011), and dramatically

---

[3] Because Theis's speech was beyond the First Amendment's coverage, we need not determine whether Defendants' interests as a public employer in regulating workplace conduct and preventing disruption outweighed Theis's First Amendment interests under *Pickering* balancing.  *See Eng*, 552 F.3d at 1071; *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 588 (1968).

changed how we analyze public-school teacher speech. It did not.

The Supreme Court in *Kennedy* was careful to limit the scope of its holding. It repeatedly emphasized that Coach Kennedy's prayer occurred when he was not engaged in his official duties, not instructing or supervising students, and not speaking in a manner that could reasonably be attributed to the school. 597 U.S. at 509. The Court described the relevant conduct as a "brief, quiet, personal religious observance" undertaken after the conclusion of his professional responsibilities. *Id*. at 543; *see also Wood*, 142 F.4th at 1293 (describing Coach Kennedy as "off the clock" when he prayed). Critically, the Court distinguished Coach Kennedy's prayer from situations in which a public-school employee is actively "engaged in . . . duties as a coach" or is otherwise interacting with students in a professional capacity. 597 U.S. at 529.

This case is different. Theis's display of books occurred in the course of performing his assigned duties and in a setting where he was responsible for interacting directly with his students. Unlike Coach Kennedy, who was off the clock, Theis was not engaged in a moment of private expression detached from his role. To the contrary, he was engaged in his core professional responsibilities.

Courts applying *Kennedy* agree that it did not unsettle the longstanding rule that speech directed at students within the four walls of an educational, K–12 setting is undertaken pursuant to a public employee's duties. We have continued to cite *Johnson* approvingly even after *Kennedy*. *See Dodge*, 56 F.4th at 774, 777–78. In *Wood*, the Eleventh Circuit squarely addressed whether a teacher's in-class speech fell within *Kennedy*'s—and the First Amendment's—protection,

and concluded that it did not. 142 F.4th at 1290. Writing for the majority, Judge Newsom relied on *Johnson* to hold that when a public-school teacher speaks "in the course of performing [his] job," including in interactions with students in class, that person does so "as a government employee, not a citizen." *Id*. at 1291–92.

Accordingly, *Kennedy* and its unique facts do not alter the analysis here. "*Kennedy* clearly established that school officials may not impose categorical, visibility-based restrictions on an employee's private religious expression or exercise *outside official duties*." *Barber v. Rounds*, 169 F.4th 577, 584 (5th Cir. 2026) (emphasis added). Where a school employee's speech occurs in a student-facing setting and in the course of performing assigned duties, it remains subject to employer control under *Garcetti* and its progeny. *See Johnson*, 658 F.3d at 967–68; *Mayer*, 474 F.3d at 479; *Evans-Marshall*, 624 F.3d at 340–41; *Wood*, 142 F.4th at 1293. "The common thread through all of these cases is that, when it comes to in-class curricular speech at the primary or secondary school level, no other court of appeals has held that such speech is protected by the First Amendment." *Evans-Marshall*, 624 F.3d at 343.

To hold otherwise would depart, without purpose or principle, from a uniform consensus among the federal appellate courts on this question. Nothing in *Kennedy* suggests such a sharp U-turn in our law. By overreading *Kennedy* and closing its eyes to over fifty years of precedent from the Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits that clearly answers the question before us, the dissent—despite its length—is cheap

cotton candy: a lot of fluff but ultimately no real substance.[4] Under *Garcetti*, if an employee is on the clock, then the school district, not the employee, decides what he can or cannot say to students, even if private citizens may object to the messages that the government permits or prohibits. *Garcetti*, 547 U.S. at 421.

## III. CONCLUSION

Because Theis's complaint is ultimately "nothing more than an ordinary employment dispute, it does not constitute protected speech and has no First Amendment protection." *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 369 (4th Cir. 1998) (en banc). The district court correctly applied *Garcetti* and our precedents, and its factual determinations are supported by the record. A plaintiff seeking a preliminary injunction must establish, among other things, a likelihood of success on the merits. *Winter v. Nat. Res. Def.*

---

[4] The dissent's reliance on Justice Powell's plurality opinion in *Regents of California v. Bakke*, 438 U.S. 265, 312 (1978), is perhaps the most perplexing. *Bakke* concerned the affirmative action admissions policy at the University of California at Davis. *Id.* at 269. And courts have long distinguished the First Amendment principles at universities from those at K–12 public schools. *Compare Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) (holding that a state investigation into the contents of a scholar's lectures "unquestionably was an invasion of [his] liberties in the areas of academic freedom and political expression—areas in which government should be extremely reticent to tread," as "[t]he essentiality of freedom in the community of American universities is almost self-evident"), *with Mayer*, 474 F.3d at 480 (holding that the First Amendment "does not entitle primary and secondary teachers, when conducting the education of captive audiences, to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system"). Citing *Bakke*—which was effectively overruled by *Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023) and which has nothing to do with this matter—rather than engaging with any of the cases that squarely address the question presented in this case, says it all.

*Council, Inc.*, 555 U.S. 7, 20 (2008).  In light of the robust body of precedent holding that educators speak as government employees when they convey messages to students within the four walls of a school, it is clear that the district court did not abuse its discretion in denying the motion for a preliminary injunction.

**AFFIRMED.**

---

VANDYKE, Circuit Judge, dissenting:

Could an American public school permit its employees to string up their own "GLOBALIZE THE INTIFADA" banners in their offices, while simultaneously banning any employees from personally decorating with the Israeli flag? Could public school administrators establish a policy allowing office decoration with partisan political messages deemed sufficiently "compassionate," but prohibit—as inherently "hostile"—any political speech that did not align with the Democratic Socialists of America platform?  Could teachers be encouraged to wear large, red pins reading "Make America Great Again" during all student interactions—but *only* those pins?

If your instinctual answer to each of these questions is "No!" … you might be an everyday American.  But according to the majority today, you vastly overestimate the First Amendment's guarantee of free speech in our nation's schools.  In a decision that is irreconcilable with Supreme Court precedent, the majority announces an expansive new rule that all expression by public-school employees that might be observed by students is necessarily government speech, and not the personal speech of an American

citizen—even when any reasonable observer would perceive the speech as the employees' own personal expression.

So you may be shocked to learn that, when a teacher hangs a family portrait behind his desk, it is the *government* commemorating filial affection, not the teacher. According to the majority, this remarkable distortion of reality is the natural consequence of our court's Free Speech jurisprudence. And because the government's own speech "falls outside the First Amendment's ambit," the Constitution presents no barrier to school administrators allowing our nation's teachers to bedeck themselves and their offices with personal Intifada banners, DSA slogans, or MAGA pins. But not with any *competing* personal messages—thus giving the grossly misleading impression of monolithic uniformity of private opinions on what are really some of the most hotly contested issues in our society today.

The hypotheticals above shock the American conscience because exactly *no one* believes the majority's legal fiction—that anything seen by students on school grounds is necessarily government speech or perceived as such. When a student sees personal materials hanging in a teacher's office, they naturally identify that ornamentation as reflecting the teacher's own personal views. Indeed, that is precisely why some teachers might object at the prospect of wearing MAGA pins in class—because they reasonably anticipate being perceived as *personally* endorsing a viewpoint they oppose. Students walking down a school hallway and seeing teachers' offices decorated only with the DSA's agenda would naturally conclude that all their teachers *personally* supported the DSA, not that the school had forbidden all rival expression. A free and open American society appropriately recoils at the prospect of

public-school teachers becoming involuntarily conscripted apparatchiks of *any* administration's particular orthodoxy.

Thankfully, the First Amendment is not actually the hollow promise to school employees that the majority reimagines in this case. Consistent with what everyone already naturally recognizes, the Supreme Court has made clear that the mere presence of students does not automatically transform all personal speech by government employees into government speech, and that school employees thus retain their rights to free, personal expression behind the schoolhouse gate. Instead, a specific and fact-intensive inquiry is required to determine if a school employee's speech is a personal expression or speech on behalf of the state. And while not all private speech is protected within the school context, school officials' distaste for a personal viewpoint can never provide an adequate justification for censorship.

This case sadly illustrates that when courts warp the distinction between personal speech and government speech, two equally bad things happen: school employees are functionally deprived of the promises of the First Amendment *and* students are fundamentally misled about many of the most contested issues facing our society today. When courts inappropriately allow the government's claimed interest in the efficient operation of a school[1] to

---

[1] I say "*claimed* interest" because, as will become evident below, it seems most likely that the school officials' real interest in censoring Mr. Theis's personal speech in this case is not efficiency or anything similarly benign, but rather something much more nefarious: to give children the false impression that all the adults in the school *personally* share the same woke perspective on some or all of the most disputed questions in our culture today. This is extremely concerning, and one glaring practical problem with the majority's misguided expansion of the

trump government employees' interests in personal speech, they equip school administrators to exercise viewpoint discrimination while regulating employee speech. Such consequences are abhorrent to our constitutional order and inconsistent with the Supreme Court's long-established caselaw.

## I.

Roderick Theis is a licensed clinical social worker who served as an Educational Specialist in eastern Oregon's InterMountain Education Service District ("IMESD") for more than fifteen years. Theis did not teach in a classroom but maintained offices in three schools, where he performed desk work and sometimes met with students to assess their educational needs.

IMESD employees "commonly decorate their offices with paintings, personal photos … posters, inspirational quotes, books, and other items." Staff decorations include endorsements of unions and politically active nonprofit organizations, gay pride flags, and Black Lives Matter posters.

During the 2022-2023 and 2023-2024 school years, Theis displayed a book, *Johnny the Walrus* by Matt Walsh, as a decoration in his Union School District office. The book's front cover displays illustrations of a boy and a walrus, and the back cover bears the tagline: "a tale of identity and imagination." During the 2024-2025 school year, Theis also placed *Johnny the Walrus* as a decoration in his Elgin School District office. Theis never used or

---

government speech doctrine in this context. But ultimately, the majority's First Amendment analysis is flawed even if we are willing to ignore the reality of what is likely really going on in cases like this.

referenced the decorative book during his work as an Educational Specialist. During the three years *Johnny the Walrus* sat in Theis's office, there was functionally no reaction. One student once asked Theis about the book.

In October 2024, Theis placed two books as decorations in his office at La Grande Middle School, *He is He* and *She is She* by Ryan and Bethany Bomberger. The books' covers display "illustrations of a smiling boy and girl, respectively, along with the tagline 'a book about your identity.'" Theis never used or referenced either decorative book during his work as an Educational Specialist.

Theis evaluated a total of four students while these two books were displayed in his La Grande office. "No student or staff members asked about those books or commented on them, no student was 'visibly upset or distracted by' them, and no one handled or read either of them."

Three weeks later, the La Grande Middle School Principal instructed Theis to "place the books out of sight." The principal explained that a La Grande teacher "had seen the books in [Theis's] office, researched them online, and then determined they were offensive." After reviewing the books, the principal "said he did not find anything offensive or inappropriate about them," but expressed concern that they "could be considered pushing a certain point of view on a student" and therefore requested that Theis remove the books "to maintain the neutrality at school."

The next day, Theis was informed that a school employee had filed a bias incident complaint against Theis based on his display of the books. One month later, Theis received a final determination that his display of the books constituted 'a hostile expression of animus toward another person relating to their actual or perceived gender identity."

Theis appealed this determination to IMESD's superintendent. Theis's appeal was denied on the basis that "the books promote a binary view of gender, which excludes and invalidates an understanding of gender diversity and transgender students, staff, and others." Theis's further appeal to IMESD's Board was denied.

In May 2025, Theis filed suit under 42 U.S.C. § 1983 alleging that IMESD and various officials had violated his First Amendment Free Speech rights by ordering him to remove the books from his office. Theis sought declaratory and injunctive relief allowing him to display the books. The district court concluded that Theis's office decorations were his own constitutionally protected personal expressions when no students were present, but government speech "during testing sessions and interactions with students." Accordingly, the district court granted Theis a partial injunction allowing him to display the books when students were absent.

Two days after the court issued its partial injunction, four eighth graders entered Theis's office before school began and directly requested to see the books. Theis asked who the students were and attempted to "redirect" them. The students persisted and Theis, operating on the assumption that the injunction allowed him to display the books when he "was not working with the [students] in [his] official duties," eventually allowed them to view the books. Perhaps coincidently, a La Grande teacher then walked by Theis's office and recorded a video of the students reading the books. The teacher subsequently filed a complaint against Theis, stating that she had video footage of him allowing students to read the books in his office.

IMESD investigated the complaint. Theis was subsequently placed on administrative leave and then terminated.

This appeal followed.

## II.

The Supreme Court has long recognized that the First Amendment is of paramount importance to our nation's public schools. "The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'" *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 312 (1978) (opinion of Powell, J.) (alteration in original) (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943), aff'd, 326 U.S. 1 (1945)). Accordingly, teachers, coaches, and other public-school employees do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. School Dist.*, 393 U.S. 503, 506 (1969). School employees are both "private citizens" and "also government employees paid in part to speak on the government's behalf and convey its intended messages." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022). When school employees convey the government's messages, their speech is subject to government regulation and control. The First Amendment speech rights of school employees are not "so boundless that they may deliver any message to anyone anytime they wish." *Id.*

Two threshold inquiries determine if a public employee's speech is protected by the First Amendment. First, courts evaluate "the nature of the speech at issue." *Id.* at 527. "If a public employee speaks 'pursuant to his or her

official duties,' [the Supreme Court] has said the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the government's own speech." *Id.* (citation modified) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). Second, courts evaluate whether the employee spoke on a matter of public concern. *Id.* at 528. If a public employee establishes that he spoke in his personal capacity on an issue of public concern, government officials may only regulate his speech if they show that they have "a legitimate administrative interest in suppressing the speech that outweigh[s] the plaintiff's First Amendment rights." *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 776–77 (9th Cir. 2022) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

## A.

To determine whether a public employee speaks in his personal capacity, the "critical question ... is whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Kennedy*, 597 U.S. at 529 (alteration in original) (quoting *Lane v. Franks*, 573 U.S. 228, 240 (2014)). The inquiry to determine the scope of an employee's professional duties "is a practical one." *Garcetti*, 547 U.S. at 424. "Statements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008) (citation modified); *see also Dodge*, 56 F.4th at 778. Employers cannot elide their employees' private speech rights simply by describing "excessively broad job descriptions" that

would encompass all possible expression. *Garcetti*, 547 U.S. at 424; *Kennedy*, 597 U.S. at 529.

In the past, our court had broadly held that "teachers *necessarily* act as teachers for purposes of a *Pickering* inquiry when at school or a school function, in the general presence of students." *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 968 (9th Cir. 2011). In other words, our court previously operated under the rule that it was impossible for teachers to speak in a personal capacity when attending school functions where their expression might be observed by students. In such contexts, no First Amendment protections were available to school employees.

But in 2022, the Supreme Court announced its decision in *Kennedy*, holding that a high-school football coach's prayer on school property within view of students was constitutionally protected private speech, *not* regulable government speech. 597 U.S. at 529–30. *Kennedy* established beyond question that not "everything teachers and coaches say in the workplace [is] government speech subject to government control." 597 U.S. at 530–31; *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 302 (2000) ("[N]ot every message" that is "authorized by a government policy and take[s] place on government property at government-sponsored school-related events ... is the government's own."); *Garcetti*, 547 U.S. at 420-21 (rejecting the notion that "all speech within [a public employee's] office is automatically exposed to restriction").[2] Some employee expression is private speech

---

[2] If *Garcetti* actually said that all expression while "an employee is on the clock" is government speech, then the majority would be correct in asserting that my interpretation of the First Amendment contradicts such a rule. But *Garcetti* says no such thing. *Garcetti* and *Kennedy* expressly

because it is not produced "pursuant to government policy" and does "not seek[] to convey a government-created message." *Kennedy*, 597 U.S. at 529.

In explaining this holding, *Kennedy* clarified that it is not dispositive that school employees' speech takes place "within the office" environment of a school. *Id.* at 530. Nor is it dispositive that "[t]eachers and coaches often serve as vital role models" and that their expressions might be perceived to carry the imprimatur of the school. *Id.*; *see also Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 250 (1990) ("The proposition that schools do not endorse everything they fail to censor is not complicated."). The Supreme Court expressly rejected the argument that any expression "an objective observer could reasonably infer" the government to endorse is definitively government speech, not private expression. *Kennedy*, 597 U.S. at 534.

To the extent that *Poway* held to the contrary—that location and the presence of students alone established government speech—that prior rule no longer remains good law. After *Kennedy*, it can't be said that a school "hires" all employee expression that may be observed by students. *Poway*, 658 F.3d at 966. A court adopting an expansive characterization of this sort "commits the error of positing an 'excessively broad job descriptio[n]' by treating everything [school employees] say in the workplace as government speech subject to government control." *Kennedy*, 597 U.S. at 530–31 (first alteration in original) (quoting *Garcetti*, 547 U.S. at 424). Not all employee speech within a school building or in the presence of students

---

reject the majority's absolutist position and make clear that some employee expression remains protected personal expression even in the educational context.

"owes its existence to a public [school] employee's professional responsibilities." *Garcetti*, 547 U.S. at 421–22; *Kennedy*, 597 U.S. at 530–31.

**B.**

Unfortunately, today the majority fails to accept that the Supreme Court's decision in *Kennedy* is irreconcilable with *Poway*'s rule that school employees "*necessarily*" speak for the government "when at school or a school function, in the general presence of students." *Poway*, 658 F.3d at 968. The majority's distinction between private and public employee expression boils down to an analysis of *where* Theis spoke (in "offices where he interacted with students as part of his assigned duties") and *who* observed his expression ("the displays were visible to those students during evaluations and meetings"). According to the majority, when these factors combine, a school employee's expression "might reasonably [be] view[ed] as official " and is thus *necessarily* government speech.

This simplistic mode of analysis is foreclosed by *Kennedy*. The fact that an employee speaks at a school facility, the fact that his expression can be observed by students, and the risk that observers could infer that the school endorses the expression do not necessarily convert his expression into government speech. *Kennedy*, 597 U.S. at 530, 534. As discussed above, *Kennedy* was explicit that each of these factors was non-dispositive. *Id.* The majority's attempts to factually distinguish *Kennedy* fall flat.

First, the majority argues that, unlike Theis, Coach Kennedy was "not engaged in his official duties" and was "not instructing or supervising students" during his private expression. As a factual matter, Coach Kennedy's private expression did occur while he was "observable to students,"

while "still on duty" during school events. *Kennedy*, 597
U.S. at 519. But *Kennedy*'s reasoning also makes clear that
the fact that an employee's personal expression occurs
*simultaneously* with government speech is not, standing
alone, dispositive.

While rejecting the argument that "everything teachers
and coaches say in the workplace [is] government speech,"
the Supreme Court specifically rejected the idea that "a
school could fire a Muslim teacher for wearing a headscarf
in the classroom." *Kennedy*, 597 U.S. at 530–31. The
majority's analysis simply cannot be reconciled with this
illustration. The headscarf, a teacher's expressive
adornment, remains constitutionally protected private
speech, notwithstanding that it is exhibited by a teacher to
her class in her classroom during school hours while she is
simultaneously speaking on behalf of the government as a
teacher. What *does* explain this illustration is the Supreme
Court's recognition that location and audience do not
necessarily transform private employee expression into
government speech in the school context.

Second, the majority alleges that Coach Kennedy, unlike
Theis, was "not speaking in a manner that could reasonably
be attributed to the school." The attribution-based test the
majority revives was squarely rejected by the Court in
*Kennedy*. 597 U.S. at 530–31, 535 (rejecting the notion that
anything "an objective observer could reasonably infer" the
government to endorse was government speech, not private
expression).

If anything, the factual similarities in *Kennedy* support a
distinction between Theis's personal expression through his
office decorations and his professional speech delivering the
government's message as an Education Specialist. In the

relevant time period, the Bremerton School District permitted Coach Kennedy and his colleagues to engage in some personal expression detached from their roles while they were on duty, speaking with friends or accepting phone calls. *Id.* at 527. Here, in the relevant context of employee offices, IMESD permitted Theis and his colleagues to engage in some personal expression detached from their roles while they were on duty, decorating their offices with pride flags, Black Lives Matter posters, and political endorsements. Sadly, if the enforcement actions instigated against either Theis or Coach Kennedy illustrate anything, it is that employees with disfavored viewpoints in schools today should not expect policies on personal expressive conduct to be "applied in an evenhanded, across-the-board way." *Kennedy*, 597 U.S. at 527.

Theis's decorations were clearly not "within the scope" of his duties as an educational specialist. *Id.* at 529. They were not expressed "pursuant to government policy" and did not "convey a government-created message." *Id.* Theis did not use the books while working with students. *Id.* at 529–30. Theis's office decorations did not owe their existence to Theis's professional responsibilities. *Garcetti*, 547 U.S. at 421. Like his colleagues' personal items—pride flags, Black Lives Matter posters, and political endorsements—Theis's placement of three children's books as decorations in his office was his own personal speech, not government speech.

## III.

The fact that Theis's speech was private expression does not render it immune from government regulation. When a government employee speaks in his personal capacity, he can only invoke the protections of the First Amendment if he can show that he spoke "on a matter of public concern."

*Garcetti*, 547 U.S. at 418. If this burden is met, courts engage in "a delicate balancing of the competing interests surrounding the speech and its consequences." *Id.* at 423. This balancing determines whether an employee's speech interests are outweighed by "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 417 (quoting *Pickering*, 391 U.S. at 568).

Not all public employees' personal speech implicates matters of public concern. "Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (quoting *Johnson v. Multnomah Cnty.*, 48 F.3d 420, 422 (9th Cir.1995)). Likewise, only a narrow set of government interests offer legitimate justifications to suppress employees' private expression. The government may only impose "those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419. "For us to find that the government's interest … outweighs an employee's first amendment right, defendants must demonstrate actual, material and substantial disruption, or reasonable predictions of disruption in the workplace." *Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1138 (9th Cir. 2025) (quoting *Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009)).

## A.

Before applying the *Pickering* factors to Theis's case, it is worth pausing briefly to observe how the interplay between the *Pickering* factors poses a potential Catch-22 to school employees attempting to raise a First Amendment

claim, and why the doctrine must be carefully applied to avoid that pitfall.

If the content of an employee's personal speech is mundane, it is unlikely that the school's administrators will be able to demonstrate that the speech has caused or will cause "actual, material, and substantial disruption" in the school. *Damiano*, 140 F.4th at 1144. But if that's so, school officials seeking to censor the speech are very likely to argue that mundane expression does not implicate matters of public concern. And "[i]f the speech in question does not address a matter of public concern, then the speech is unprotected." *Eng*, 552 F.3d at 1070–71.

On the other hand, if a school employee's personal speech expresses a viewpoint relating to a hot-button "matter of political, social, or other concern to the community," it is unlikely that the school's administrators will be able to dispute that the speech is a matter of public concern. *Id.* at 1070 (quoting *Johnson*, 48 F.3d at 422). Instead, school administrators seeking to censor the speech will instead argue that the contentious content has caused or will cause "actual, material, and substantial disruption" in the school. *Damiano*, 140 F.4th at 1144. And if the government establishes a substantial disruption, the employee's speech is, again, unprotected. *Id.* at 1138.

This Catch-22 has the potential to deprive school employees working in a divided and contentious society of their free speech rights entirely. To ensure that—as the Supreme Court expressly requires—employees retain the protections of the First Amendment behind the schoolhouse gate, lower courts must avoid a series of *Pickering* balancing traps that can easily distort the parties' burdens, rubber-

stamp a heckler's veto, or ossify unconstitutional administrative viewpoint discrimination.

First, courts must resist the temptation to conflate the question of "public concern" and the question of "actual or foreseeable disruption." There may be good reasons to assume that it is precisely matters of political and social concern that prompt the most virulent and contentious reactions. But our case law demands that these two questions be evaluated independently, without any reliance upon general assumptions that disruption will inevitably follow a contested viewpoint. "[T]he government must support its claim that it reasonably predicted disruption by some evidence, not rank speculation or bald allegation." *Damiano*, 140 F.4th at 1138 (internal quotation marks omitted) (quoting *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 725 (9th Cir. 2022)). This burden must be enforced stringently. "Because speech about matters of public concern occupies the highest rung of the hierarchy of First Amendment values, an employer must make an even stronger showing of disruption when the speech at issue deals 'directly with issues of public concern.'" *Id.* at 1139 (9th Cir. 2025) (citation modified) (citations omitted).

Second, some types of disruption can *never* justify suppression of an employee's First Amendment rights. "Speech cannot be … punished or banned, simply because it might offend a hostile mob." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134–35 (1992). *Pickering*'s "disruption" inquiry is not an invitation to award those on one side of a political or social dispute a heckler's veto over private speech in schools simply because they are willing to disrupt the school's regular operation whenever they confront an opposing viewpoint.

Likewise, some negative reactions simply do not reach the high bar of "actual disruption." Disruption requires "something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. Evidence that others within the school felt "intimidated, shocked, upset, angry, scared, frustrated, and didn't feel safe after learning about" plaintiff's expression does not, standing alone, establish disruption. *Dodge*, 56 F.4th at 782 (citation modified). "Speech that outrages or upsets co-workers without evidence of any actual injury to school operations does not constitute a disruption." *Id.* (internal quotation marks and citation omitted).

Third, even when confronting employees' speech that is actually disruptive, the government is never permitted to engage in viewpoint discrimination. *Rosenberger v. Rector & Visitors of Univ. of Via.*, 515 U.S. 819, 829 (1995) (forbidding the State from "exercis[ing] viewpoint discrimination, even when the limited public forum is one of its own creation); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391–94 (1992) (holding that the government "has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules"). Thus, when a school district "allow[s] private persons to display BLM posters on school walls," it "open[s] school walls to the discussion of similar topics" such that it cannot constitutionally deny others the right to display posters with "the phrases 'All Lives Matter' and 'Blue Lives Matter.'" *Cajune v. Indep. Sch. Dist. 194*, 105 F.4th 1070, 1083 (8th Cir. 2024). "[D]isagreement with a disfavored political stance or controversial viewpoint, by itself, is not a valid reason to curtail expression of that viewpoint at a public school." *Dodge*, 56 F.4th at 786.

Schools are far from powerless when it comes to regulating employees' disruptive private speech. But disruptions must be addressed using viewpoint-neutral regulation. "A government employer can categorically prohibit political speech as a valid administrative interest such that the prohibition does not favor or disfavor any particular view." *Dodge*, 56 F.4th at 787. But school administrators cannot simply impose their own "viewpoint preference[s]" by permitting employee speech of a particular bent while excluding all else. *Id.*

### B.

So what does the *Pickering* analysis, properly conducted in this case, tell us? After reviewing the record in this case, nothing could support the conclusion that the government's interest in efficiently operating its public schools outweighed Theis's speech interest. Here, "the Parties agree that the display of the books amounted to speech on a matter of public concern." And, after *three years* of Theis's use of the books in decorating his office, the record contains no evidence whatsoever of "actual, material, and substantial disruption" in the school. *Damiano*, 140 F.4th at 1144.

The only negative reaction to the books—the bias incident complaint, and Theis's subsequent two-year legal battle to obtain the protections of the First Amendment—all originated from a single, adult teacher who saw "the books in [Theis's] office, researched them online, and then determined they were offensive." Simply put, "[s]peech that outrages or upsets co-workers without evidence of any actual injury to school operations does not constitute a disruption." *Dodge*, 56 F.4th at 782 (internal quotation marks and citation omitted).

The mere fact that we all know that issues surrounding gender dysphoria are of public concern and highly contentious does not allow school administrators to assume, without evidence, that any reference to the subject will prompt actual disruption of their educational operations. *See Damiano*, 140 F.4th at 1138. Nor can school administrators justify their censorship of employees' private speech by simply labeling one side of a public debate—in this case, a view held by most Americans—categorically "hostile." *R.A.V.*, 505 U.S. at 391–94. And under no circumstances whatsoever does the First Amendment permit school administrators to exercise that kind of viewpoint discrimination to selectively censor the private speech of employees. *Rosenberger*, 515 U.S. at 829.

Because Theis's office decorations related to a matter of public concern and because the record contains no evidence of a threat to IMESD's interests that could outweigh Theis's speech interest, Theis's expression is protected by the First Amendment. This is not that hard of a case.

\* \* \*

The promise that public-school employees do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Kennedy*, 597 U.S. at 527 (quoting *Tinker*, 393 U.S. at 506), is rooted in our nation's recognition of "the necessity for informed, vibrant dialogue in a democratic society," *Garcetti*, 547 U.S. at 419. Under the American constitutional order, "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The First Amendment offers our nation its only legal defense against laws and administrative overreach "that cast a pall of

orthodoxy over the classroom." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870 (1982) (citation omitted).[3]

The Supreme Court developed its school speech jurisprudence to deliver these foundational promises to American citizens. The *Garcetti* test was established to distinguish private employee expression from government speech and expressly rejected the notion that "all speech within [a public employee's] office is automatically exposed to restriction." *Garcetti*, 547 U.S. at 421. That standard guaranteed First Amendment protection to more than closed-door soliloquy. When lower courts interpret *Garcetti* so broadly that all employee speech that might be observed by students is designated government speech, they effectively deprive our nation's public-school workers of any opportunity for free expression. School employees simultaneously lose their First Amendment defense against the mandatory expression of viewpoints they oppose.

Likewise, the *Pickering* balancing analysis was developed to ensure that public employees' private speech is censored only when necessary for the government to avoid actual disruption to its operations. But when lower courts allow a single, disgruntled activist—who holds the minority

---

[3] I cite these cases for the same reason I cite *Bakke*: not as controlling precedent, but as clear articulations of the fundamental principles embodied in the First Amendment. The majority finds this "perplexing" only because it improperly rejects the premise that the First Amendment extends any protection at all to the personal expression of school employees that could be observed by pre-university students. But as explained, that is not the law. Nor should it be. An attempt by government administrators to mislead minor students about even the existence of hotly disputed social issues is, if anything, *more* concerning than it is in the university context.

position in a hot-button public dispute, even if school administrators apparently agree with her—to instigate the censorship of any expression with which she disagrees, the analysis becomes a tool for coercive social manipulation. "Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Rankin v. McPherson*, 483 U.S. 378, 384 (1987).

All of this is especially sinister in the context of our nation's public educational system. When school administrators wield both an expansive definition of government speech and court-sanctioned viewpoint discrimination, they can shape *every* expression a student encounters during the many years of primary, secondary, and postsecondary education. Unbeknownst to the students, government orthodoxy defines more than the content of their curriculum. Like here, carefully calibrated administrative policy can permit school employees to openly and pervasively share personal viewpoints that administrators favor—in their office decorations, the posters on their walls, the pins on their shirts—while simultaneously censoring all personal expressions of more mainstream (but disfavored among the educational elite) viewpoints that school administers deem unfit for public consumption. The distortion is likely to be convincing. Students never see the Orwellian "bias incident complaints" ordering that all expressions of thoughtcrime be promptly memory-holed. They just experience the end result: every one of their teachers who speaks out on a controversial issue just so happens to hold the same point of view. It's little wonder that students who grow up in such an artificially monolithic environment find themselves later in life incapable of

engaging in rational and civil discourse with those whom they disagree.  In what sense are American students in such a system "trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection"?  *Bakke*, 438 U.S. at 312 (citation modified) (citation omitted).

They're not.  Unwilling to dilute the First Amendment to such an extent, and with serious concerns about the long-term effects of the majority's misapplication of the Constitution in this case, I must respectfully dissent.